## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

| | |
|---|---|
| RB JAI ALAI, LLC; RICHARD BIRDOFF; AND DAVID P. CATINA )<br><br>*Plaintiffs*,  )<br><br>vs.  )<br><br>FLORIDA DEPARTMENT OF TRANSPORTATION; ANANTH PRASAD, IN HIS OFFICIAL CAPACITY AS SECRETARY OF FLORIDA DEPARTMENT OF TRANSPORTATION; FEDERAL HIGHWAY ADMINISTRATION; AND JAMES CHRISTIAN IN HIS OFFICIAL CAPACITY AS DIVISION ADMINISTRATOR OF THE FEDERAL HIGHWAY ADMINISTRATION,  )<br>*Defendants*.  ) | 6:13-CV-1167-PGB-GJK<br><br>**AFFIDAVIT OF DAVID P. CATINA IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS** |

STATE OF FLORIDA          )
                          ) SS:
COUNTY OF SEMINOLE   )

DAVID P. CATINA, being duly sworn, deposes and says:

1. I am a Plaintiff in the above-captioned action, and the general manager of the business operated by Plaintiff RB Jai Alai, LLC ("Jai Alai"). I submit this affidavit in support of Plaintiffs' motion for an order preliminarily enjoining Defendants' construction and funding of an elevated overpass ("the Flyover") at the intersection of US 17-92 and SR 436 (the "Intersection"), immediately adjacent to Jai Alai's business, and in opposition to Defendants' motions to dismiss the Second Amended Verified Complaint (the "Complaint").

<u>The Flyover Threatens to Expose Plaintiffs to Hazardous Substances, Disturb Wetlands, and Restrict Access to the Corridor Where Plaintiffs Own Property and Work</u>

2. Jai Alai operates an entertainment facility known as Orlando Live Events ("OLE") at 6405 S. US Hwy 17-92 in unincorporated Seminole County (the "Site"), less than 500 feet from the Intersection and directly adjacent to the site of the proposed Flyover. Jai Alai's operations at the Site feature jai alai contests, concerts, movies, a restaurant, special events, and other activities.

3. Jai Alai has approximately 50 employees and attracts thousands of customers each year.

4. As the general manager of Jai Alai's business, I am present on the Site for work an average of six days per week. I typically access the Site from the Intersection, as do many of Jai Alai's employees and customers.

5. Around 2003, Defendant Florida Department of Transportation ("FDOT") proposed bypassing the Intersection with the approximately 2,100-foot long Flyover, diverting vehicles over SR 436. In addition to the Flyover, FDOT proposed the widening of SR 436 and other infrastructure improvements in the vicinity of the Intersection (collectively, with the Flyover, the "Project").

6. At that time, FDOT asserted that the Flyover was needed "to satisfy both existing and future traffic conditions …" In support of that claim, FDOT relied upon a Design Traffic Report that extrapolated from data collected in 2002 to predict traffic volumes in 2010 and beyond.

7. The Project's construction activities will occur within approximately half a mile of the Site. Due to the Site's proximity to the Flyover, and my frequent use of the Site, I will be directly affected by any air pollution, noise, the release of hazardous materials, and other construction impacts, as well as by blighting and other adverse land use changes within the commercial community where Jai Alai's business is located.

8.  Construction of the Flyover would disturb sites with suspected contamination, increasing the risk of exposure to hazardous substances. According to FDOT, 10 sites in the vicinity of the Flyover have a "high" or "medium" risk of contamination. However, as far as I am aware, the precise location of those sites and the specific impacts of such disturbances have not been disclosed by Defendants, and such information is not contained within the Administrative Record filed by Defendant Federal Highway Administration ("FHWA") in this matter.

9.  Construction of the Flyover would also require "demucking" at most of the wetland sites" surrounding the construction area. The neighborhood around the Site is populated by numerous wetlands areas, including Grassy Lake and adjacent marshlands directly to the west of the Flyover.

10. According to the Seminole County Comprehensive Plan, "conservation of intact wetland systems … is beneficial to a sound water system, wildlife and to residents of Seminole County."

11. During my regular presence in the area around the Site, I frequently view and enjoy the surrounding wetland areas.

12. Finally, construction of the Flyover would significantly restrict vehicle and pedestrian access to the area surrounding the Intersection, which the Seminole County Board of Commissioners has identified as a "regionally important intersection," with "the most market absorption potential throughout the US 17-92 Corridor."

13. For instance, vehicles travelling southbound on US 17-92 can currently access the Site by making one left turn onto Fernwood Boulevard. After completion of the Flyover, vehicles would have to proceed over SR 436, travel approximately 1,350 feet to the US 17-92

and Prairie Lake Drive intersection, make a U-turn (assuming such turns are permitted), travel back 1,350 feet, and only then turn right onto Fernwood Boulevard.

14. The Flyover would also constrain pedestrian access to the Site by creating a barrier to the crossing of US 17-92, and would impair the visibility of the bypassed area from US 17-92. While Jai Alai and other local businesses currently attract customers with elevated signs designed to be noticed from the highway, the Flyover would reduce the visibility of those signs.

15. By diverting potential customers away from the bypassed area, eliminating the primary means of ingress and egress, and restricting visual access, the Flyover threatens the viability of surrounding businesses, limiting opportunities for redevelopment and increasing the risk of neighborhood blight.

Defendants' Review of the Flyover Deferred Critical Analyses and Excluded Necessary Information

16. FDOT requested federal-aid funding for the Flyover from FHWA, triggering the requirements of the National Environmental Policy Act ("NEPA") and the Federal-Aid Highways Act ("FAHA").

17. In February 2004, FDOT and FHWA declared a categorical exclusion for the Flyover under FHWA's NEPA regulations, based upon an Environmental Determination form prepared by FDOT.

18. The Environmental Determination acknowledged that investigation into contaminated sites surrounding the Flyover was still ongoing, stating that 10 sites with a "high" or "medium" risk of contamination "will be investigated further prior to construction" and that "any necessary cleanup plans will be developed" at a later date.

19. The Environmental Determination also deferred the analysis of potential impacts on the wetlands, explaining that "during the Project's final design/permitting phase … the Department

4

will reevaluate wetlands affected by the project … [to] determine if [such] wetlands … will be impacted and if those wetlands support suitable hydroperiods for foraging habitat" for the threatened wood stork and other wildlife species.

20. The Environmental Determination did not assess the socioeconomic impact of restricting vehicle and pedestrian access to the surrounding businesses, or identify the specific contaminated parcels or wetland areas affected by the Flyover.

21. In the years following Defendants' categorical exclusion, numerous Seminole County planning documents expressed concerns about the Flyover's impacts on the existing commercial corridor and on regional planning and land use objectives. In 2006, the US 17-92 Community Redevelopment Agency ("CRA") – a planning body consisting of and governed by the Seminole County Board of County Commissioners – warned that "under the planned US 17-92 flyover at SR 436, access and visibility to the site from US 17-92 is significantly impaired …"

22. These concerns were subsequently incorporated into the Seminole County Comprehensive Plan, which was amended to endorse "the goals, objectives and policies of the Seminole County US 17-92 CRA 2006 Corridor Strategy."

23. In its 2011 <u>US 17-92 Corridor Redevelopment Master Plan</u> (the "<u>Master Plan</u>"), the CRA warned that "due to the proposed FDOT 17-92 fly-over, future development of parcels located within this area could be negatively impacted unless an alternative circulation and land use pattern can be established." The <u>Master Plan</u> recommended "a detailed transportation planning study … to determine the effects of the proposed US 17-92 flyover on surrounding roadways and private development parcels to minimize negative impacts and create a proactive strategic plan for the future."

<u>Defendants' Reevaluation Fails to Consider Changed Circumstances and New Data</u>

5

24. After the 2004 approval, Defendants' plans for the Flyover languished, and FDOT projected that construction would not begin until 2025 or 2026. In 2012, eight years after the Flyover's initial review, Defendants prepared a reevaluation pursuant to FHWA regulations to determine whether the prior categorical exclusion remained valid (the "Reevaluation").

25. The Reevaluation did not address the Flyover's consistency with land use plans that had been issued since 2004, and the Administrative Record filed by FHWA does not contain any reference to such plans.

26. Neither the Reevaluation nor the Administrative Record contained the results of the contaminated site investigations that Defendants had undertaken since 2004, although the Reevaluation does confirm the need for further investigation at five such sites.

27. Similarly, the Reevaluation and Administrative Record provided no additional information about the Flyover's wetland impacts or the results of the promised reevaluation of such impacts on wood stork habitat.

28. Finally, the Reevaluation did not contain any new traffic data or updated traffic analysis, even though by 2012 the traffic counts underlying the categorical exclusion were a decade old. Instead, relying almost entirely upon Defendants' 2004 analysis, the Reevaluation concluded that "no substantial changes have occurred in the social, economic or environmental effects of the proposed action that would significantly affect the quality of the human environment." Thus, Defendants reaffirmed the prior categorical exclusion.

<u>Defendants Ignored Data Disproving The Traffic Projections Used to Justify the Flyover</u>

29. While the Reevaluation did not contain any updated traffic analysis, Jai Alai and other local businesses retained CPH Engineers, Inc. a nationally recognized engineering firm

based in Seminole County, to reassess FDOT's prior traffic predictions using traffic data collected in 2012.

30. The 2012 Traffic Study found that actual peak usage of the Intersection was lower than it had been in 2002, and approximately 33% below the projected traffic volumes for the year 2010 which Defendants had relied upon in approving the Flyover.

31. While acknowledging that roadway improvements were warranted, based upon this updated data CPH Engineers concluded that "there are at-grade improvements that can be made to improve the current operation and accommodate future traffic volumes … without the need for the [Flyover]."

32. The 2012 Traffic Study proposed specific, at-grade improvements that would attain FDOT's traffic calming objectives. As set forth by John L. Limarzi, P.E., a traffic engineer whose affidavit was previously filed in this matter (Docket No. 26-2), at-grade improvements could be completed in an estimated 700 days for a cost of $10-$12 million, compared to an estimated 900 days and a cost of $23,000,000 for the Flyover.

33. Along with the 2012 Traffic Study, CPH Engineers prepared an Impact Analysis Report that measured the impact of the Flyover on the existing commercial neighborhood. Confirming the CRA's findings, the Impact Analysis Report concluded that the Flyover will result in "decreased and more complex accessibility to the site," impairing the "the subject site's (as well as surrounding parcels) access, economic and redevelopment opportunities."

34. Plaintiffs submitted the 2012 Traffic Study and Impact Analysis Report to FDOT in May 2012, well before Defendants commenced construction of the Project. Defendants acknowledged receipt of those studies, but did not reevaluate the Flyover's categorical exclusion,

7

recalculate its traffic projections, or reconsider the underlying need for the Flyover in light of that submission. Instead, Defendants commenced construction earlier this year.

35. While construction activities to date are seemingly consistent with the at-grade Boulevard plan proposed by Plaintiffs, FDOT is anticipated to begin construction of the Flyover itself imminently. In the absence of a preliminary injunction, the Flyover will be constructed and its adverse impacts will be suffered before such impacts can be subject to the scrutiny and analysis that NEPA and FAHA command. To avoid irreparable harm that may be mitigated or avoided entirely through this required analysis, Plaintiffs respectfully request a preliminary injunction against the construction or funding of the Flyover until Plaintiffs' legal challenges may be heard and decided.

Dated: 7-28-14

David P. Catina

Sworn to this 28 day
of July, 2014

_____
Notary Public

Notary Public State of Florida
Salvator DeNitto
My Commission EE154570
Expires 01/15/2016