**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

RB JAI ALAI, LLC, et al.,

      Plaintiffs,

v.                                         Case No:  6:13-cv-1167-Orl-40GJK

SECRETARY OF THE FLORIDA
DEPARTMENT OF TRANSPORTATION, et al.,

      Defendants.
_____

## <u>ORDER</u>

This cause comes before the Court without oral argument on the following:

1. Plaintiffs' Motion for Summary Judgment and Consolidated Memorandum of Law (Doc. 105), filed November 5, 2014;

2. State Defendants' Cross-Motion for Summary Judgment and Response in Opposition to Plaintiffs' Motion for Summary Judgment (Doc. 112), filed November 24, 2014;

3. Federal Defendants' Cross-Motion for Summary Judgment (Doc. 114) and Combined Memorandum in Support (Doc. 115), filed November 24, 2014;

4. Plaintiffs' Brief in Opposition to Defendants' Cross-Motions for Summary Judgment and in Further Support of Plaintiffs' Motion for Summary Judgment (Doc. 117), filed December 15, 2014;

5. Federal Defendants' Supplemental Brief on Summary Judgment (Doc. 123), filed May 5, 2015;

6. State Defendants' Supplemental Brief in Opposition to Summary Judgment for Plaintiffs (Doc. 124), filed May 5, 2015; and

7. Plaintiffs' Response to Supplemental Brief on Summary Judgment (Doc. 125), filed May 12, 2015.

Upon consideration and review of the record, including all pleadings, affidavits, declarations, exhibits, the Administrative Record, and memoranda of counsel, the Court grants summary judgment in favor of Plaintiffs.

## I.    BACKGROUND

### A.    NEPA: Our National Charter for Protecting the Environment

Following nearly a century of rapid economic expansion, population growth, industrialization, and urbanization, it had become clear by the late 1960s that American progress had an environmental cost. *See* 42 U.S.C. § 4331(a); 115 Cong. Rec. 26,571 (1969) (remarks of Rep. John Dingell). A congressional investigation into the matter yielded myriad evidence indicating a gross mismanagement of the country's environment and resources, most notably at the hands of the federal government. S. Rep. No. 296, 91st Cong., 1st Sess. 8 (1969); Thomas O. McGarity, *The Courts, the Agencies, and NEPA Threshold Issues*, 55 Tex. L. Rev. 801, 805 (1977) (noting "a remarkable consensus of opinion" that the federal agencies contributed substantially to the country's degraded environmental state). As a result, lawmakers and the general public alike called for an urgent and sweeping policy of environmental protection.

Congress answered these calls by enacting the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370h, which has now served for forty-five years as "our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). With NEPA, Congress mandated that federal agencies take a "hard look" at the environmental consequences of their actions and to engage all practicable measures to prevent environmental harm when engaging in agency action. *Kleppe v. Sierra Club*, 427 U.S.

390, 409, 410 n.21 (1976) (citing 42 U.S.C. § 4331(b)).  Furthermore, to remedy the widespread mistrust of the federal agencies, Congress incorporated within NEPA "action-forcing" provisions which require agencies to follow specific procedures in order to accomplish any federal project.  *Id.* at 409 & n.18.

The cornerstone action-forcing provision within NEPA is the environmental impact statement ("EIS").  As an agency plans a major federal action, it is required to consider the environmental impacts of that action.  40 C.F.R. § 1500.1.  Projects that are generally known by the agency through its experience to significantly affect the quality of the human environment necessitate the preparation of an EIS, which describes in detail both the positive and negative environmental impacts of the action and analyzes other alternatives that might provide the same benefits at a lower environmental cost.  *See id.* §§ 1502.1–1502.25.  Conversely, projects that are known by the agency through its experience to not significantly affect the human environment (either individually or cumulatively) can be classified as categorical exclusions ("CEs"), relieving the agency of the EIS requirement.  *Id.* § 1508.4; *see also id.* § 1501.4(a).  Finally, where an agency's regulations do not classify a major federal action as a CE or as one requiring an EIS, or where an agency is unsure of how a particular project should proceed, the agency will prepare an environmental assessment ("EA") to briefly and concisely determine whether an EIS is necessary.  *Id.* §§ 1501.4(b), 1508.9.  An EA will result in the agency either deciding to prepare a full EIS or filing a "finding of no significant impact," which, like a CE, dispenses with the EIS requirement.  *Id.* § 1508.13.

Ultimately, NEPA does not mandate that an agency reach any particular decision, only that the agency follows NEPA's procedures to arrive at an informed decision.  *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978).

It is therefore well-settled that even environmentally harmful projects will satisfy NEPA as long as the appropriate procedures are followed. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350–51 (1989). In that sense, the rights NEPA provides are procedural, not substantive. *Vt. Yankee*, 435 U.S. at 558.

Being the foundation of American environmental policy, NEPA also serves as the environmental backdrop to other federal statutes, which in turn require compliance with NEPA in order to pursue federal action under their provisions. Relevant to the instant case, the Federal-Aid Highway Act, ("FAHA"), 23 U.S.C. §§ 101–170, requires federal agencies and state agencies who seek federal funding for proposed highway projects to conduct the appropriate environmental review under NEPA. *Id.* §§ 128, 139. Consequently, the failure to conduct adequate environmental review in violation of NEPA similarly violates FAHA.

### B.     Facts

The dispute in this case arises out of the construction of a multimillion dollar state-



and federally-funded highway project in Casselberry, Florida[1] (hereinafter the "Flyover Project"). The Flyover Project consists of changing the existing at-grade intersection at US 17-92 and SR 436 to an above-grade, elevated highway overpass which will allow traffic traveling on US

*Figure 1*

---

[1]   The City of Casselberry is located within the Orlando metropolitan statistical area.

17-92 to cross over SR 436 without interruption (*see* Figure 1).  (AR 0405–0408).[2]  The Flyover Project also involves adding frontage roads to allow access to local roadways, widening SR 436 to include additional left-turn lanes, and improving sidewalks, bicycle lanes, drainage systems, and landscaping.  (*Id.*).  The impetus for the Flyover Project lies in the need "to provide adequate capacity to satisfy both existing and future traffic conditions" at the intersection, which currently operates at a failing level of service.  (AR 0406).

In an effort to comply with NEPA and FAHA, Defendants conducted numerous studies of the potential impacts the Flyover Project may have on the environment, including a Cultural Resource Assessment Survey (AR 0201–0326), an Endangered Species Biological Assessment (AR 0327–0344), an Air Quality Report (AR 0345–0365), and a Noise Quality Report (AR 0366–0401).  All of these studies concluded that the Flyover Project will not significantly impact the environment.  Defendants also held a public hearing which yielded no notable concerns.  (AR 0426–0615).  As a result, in February 2004, Defendants approved the Flyover Project as a CE, exempting it from further environmental scrutiny.  (AR 0402–0425).

The Flyover Project was re-evaluated twice prior to the start of construction.  In 2005, Defendants conducted a re-evaluation to consider the environmental impacts of minor changes to safety and traffic flow issues.  (AR 0616–0621).  Defendants ultimately found these design changes would inflict no significant impact on the environment and affirmed the Flyover Project's status as a CE.  (AR 0616).  Defendants conducted a second re-evaluation in 2012 because of design changes to the length of the overpass and to the width of a median.  (AR 0623–0637).  Defendants determined that these

---

[2]   The Administrative Record (Doc. 45) will be cited as (AR ####).

changes would also have no significant impact on the environment and again affirmed the Flyover Project's status as a CE.  (AR 0624).  Construction for the Flyover Project began on October 10, 2013; to date, more than 80% of construction is complete and more than 96% of federal funds allocated to the highway project have been spent.  (Doc. 124-3, ¶¶ 3–5).

Plaintiffs initiated this lawsuit on August 1, 2013 (Doc. 1) and filed the operative complaint on July 1, 2014 (Doc. 57).  Plaintiffs consist of a sports and entertainment facility located directly adjacent to the Flyover Project's site, the facility's owner, and the facility's general manager.  Defendants consist of the Florida Department of Transportation, the Federal Highway Administration ("FHWA"), and the agencies' respective administrators.

Plaintiffs allege that Defendants violated NEPA by failing to adequately consider the Flyover Project's environmental impacts.  Plaintiffs additionally allege that Defendants violated FAHA by approving federal funding for a project that did not comply with NEPA. Plaintiffs essentially contend that Defendants' 2012 re-evaluation failed to address new and changed circumstances to land use patterns, traffic patterns, contaminated sites, and impacts to wetlands.[3]  Because neither NEPA nor FAHA grant a private right of action, Plaintiffs bring their claims through the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706.  On November 24, 2014, the parties moved for summary judgment.

During its consideration of summary judgment, the Court determined that Plaintiffs were entitled to judgment as a matter of law on grounds they did not raise in their motion.

---

[3]   In their Second Amended Verified Complaint, Plaintiffs also challenge Defendants' initial 2004 classification of the Flyover Project as a CE on the basis that they failed to adequately consider the project's environmental impacts.  However, on motion to dismiss, the Court determined that any challenge to the initial classification as a CE was barred by the statute of limitations.  (Doc. 88, pp. 16–19).

Specifically, upon review of the Administrative Record and the applicable law, the Court concluded that the Flyover Project is not the type of project that may be categorically excluded under NEPA and FAHA.   Accordingly, and pursuant to Federal Rule of Civil Procedure 56(f), the Court notified Defendants of its intent to enter summary judgment in favor of Plaintiffs and invited Defendants to brief the Court as to why summary judgment on these grounds would be inappropriate.   (Doc. 122).   Defendants filed their supplemental briefs (Docs. 123, 124) and Plaintiffs responded (Doc. 125).  This matter is now ripe for review.

## II.    STANDARD OF REVIEW

District courts review agency action under the "arbitrary and capricious" standard. *Sierra Club v. U.S. Army Corps of Eng'rs*, 295 F.3d 1209, 1216 (11th Cir. 2002).  This standard does not require the agency to have taken the best or most reasonable action and does not permit the district court to review the agency's action with the benefit of hindsight.  *Druid Hills Civic Ass'n, Inc. v. Fed. Highway Admin.*, 772 F.2d 700, 708–09 (11th Cir. 1985).  Rather, the agency's action need only be a rational one which it selected by following its established decision-making process.  *See id.*  A district court may therefore only set aside an agency's action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law [or found to be] without observance of procedure required by law."  *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1360 (11th Cir. 2008) (quoting 5 U.S.C. § 706(2)) (internal quotation marks omitted).  Agency action is presumed valid until proven otherwise.  *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009), *cert. denied*, 561 U.S. 1051 (2010).  As such, the district court's review of agency action is "exceedingly deferential," *Van Antwerp*, 526 F.3d at 1360 (internal quotation marks omitted), and the court should defer to the agency's

interpretation of its own regulations where that interpretation is reasonable, *United States v. Larionoff*, 431 U.S. 864, 872 (1977).

## III.   DISCUSSION

Defendants move for summary judgment on numerous grounds.  First, they argue that Plaintiffs lack standing to challenge the Flyover Project under NEPA.  Second, Defendants assert that Plaintiffs' claims are moot due to the substantial completion of the Flyover Project.  Third, Defendants state that Plaintiffs have run out of time to bring this lawsuit, as their claims are barred by the APA's six year statute of limitations or, in the alternative, by the doctrine of laches.  Fourth, Defendants affirm that the Flyover Project was properly classified as a CE under NEPA.  Finally, Defendants maintain that they took the necessary "hard look" in evaluating and re-evaluating the Flyover Project's potential environmental impacts.

Because Defendants' challenges to standing, mootness, and timing of suit cast doubt upon whether the Court has subject matter jurisdiction—and, therefore, whether the Court may consider this case in the first place—those issues must be resolved first. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998).  The Court will then proceed to the merits.

### A.   Standing

Standing to bring and maintain a lawsuit is fundamental to a federal court's subject matter jurisdiction.  *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 340–42 (2006).  "The party invoking federal jurisdiction bears the burden of proving standing."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  On summary judgement, "the plaintiff can no longer rest on . . . mere allegations, but  must set forth by affidavit or other evidence specific facts" proving that he has standing.  *Id.* at 561 (internal quotation marks omitted).

In order to prove standing, Plaintiffs must satisfy Article III's constitutional standing requirements and NEPA's statutory standing requirements. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386, 1388–91 (2014). As to constitutional standing, Article III requires Plaintiffs to establish three elements: (1) they have suffered or are imminently threatened with a concrete and particularized injury-in-fact, (2) their injury was or will be caused by the action they challenge, and (3) it is likely, as opposed to merely speculative, that the injury they face will be redressed by a favorable judicial decision. *See Lujan*, 504 U.S. at 560–61, 572–73 nn.7–8. As long as one of the Plaintiffs satisfies the standing inquiry, the lawsuit may proceed. *See Bowsher v. Synar*, 478 U.S. 714, 721 (1986).

Defendants challenge Plaintiffs' constitutional standing solely on the grounds that they cannot establish the requisite injury-in-fact. (Doc. 112, pp. 16–21; Doc. 115, pp. 8–10). In environmental cases like this one, Plaintiffs can establish the injury-in-fact element by showing that they live near or use the affected area and that their aesthetic or recreational enjoyment of the area will be diminished by the agency action they challenge. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000); *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1280 (11th Cir. 2015) ("[A]n individual plaintiff may show injury-in-fact 'by attesting that he uses, or would use more frequently, an area affected by the alleged violations and that his aesthetic or recreational interests in the area have been harmed.'"). By way of sworn affidavit, Plaintiff David Catina affirms that he works directly adjacent to the construction site six days per week and that he fears the diminution of his ability to enjoy nearby wetlands and natural areas in addition to health and safety injuries from the Flyover Project in the form of exposure to hazardous substances and pollution. (Doc. 107, ¶¶ 5,

9, 11–14).  Because Mr. Catina has articulated an imminent threat to his concrete and particularized interests at the hands of Defendants and a favorable judicial decision will remedy the harm threatened, he has met Article III's requirements.  As a result, Plaintiffs easily satisfy constitutional standing.

In addition to constitutional standing, Plaintiffs must also satisfy the two-pronged statutory standing inquiry.  First, Plaintiffs must fall within NEPA's "zone of interests." *Lexmark*, 134 S. Ct. at 1388.  Under this prong, the determination of whether Plaintiffs fall within the zone of interests is generally "a straightforward question of statutory interpretation," requiring the Court to look to the statute's purpose where that purpose is unambiguous.  *Id.*  Overall, the zone of interests test "is not especially demanding" and Plaintiffs will fall within NEPA's zone of interests as long as their interests are not "so marginally related to or inconsistent with the purposes implicit in the statute." *Id.* at 1389 (internal quotation marks omitted).  Second, Plaintiffs must demonstrate that their injuries were proximately caused by Defendants' wrongful conduct.  *Id.* at 1390.  Injuries that are "too remote" from Defendants' conduct will not suffice.  *Id.* (internal quotation marks omitted).

Defendants contend that Plaintiffs fall outside NEPA's zone of interests because they allege purely economic injuries.  (Doc. 112, pp. 16–21).  It is true that NEPA does not confer standing to plaintiffs who claim only economic harm; there must be some nexus between Plaintiffs' injuries and harm to the environment.  *See Ouachita Watch League v. Jacobs*, 463 F.3d 1163, 1173 (11th Cir. 2006); *cf. Pack v. Corps of Eng'rs of U.S. Army*, 428 F. Supp. 460, 464 & n.1 (M.D. Fla. 1977) ("A financial interest in the outcome [of NEPA litigation] is not in and of itself sufficient to exclude the plaintiffs from having standing.").  However, Defendants read the word "environment" too narrowly, implying

that the term only relates to matters of the biosphere and ecosphere.  As the Court discussed at length in its order on Defendants' motions to dismiss, "NEPA's zone of interests can be said to include the environment, quality of life, land use and resource management, economic growth, and public health and safety." *RB Jai Alai, LLC v. Sec'y of Fla. Dep't of Transp.*, 47 F. Supp. 3d 1353, 1362–63 (M.D. Fla. 2014).  Indeed, Congress defined NEPA's purpose broadly to "encourage productive and enjoyable harmony between man and his environment [and] to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man."  42 U.S.C. § 4321.  In fact, NEPA takes special care to emphasize that it seeks to promote the "human environment," which includes both "the natural and physical environment and the relationship of people with that environment."  40 C.F.R. § 1508.14.

Defendants are therefore incorrect when they assert that Plaintiffs allege only economic injuries.  While Plaintiffs express concerns about the business they will lose because of the Flyover Project, Plaintiffs also go into detail about how their injuries derive from Defendants' misuse of land and resources—namely, economic decay and blight— as the elevated overpass is inconsistent with various local growth plans.[4]  (Doc. 106, ¶¶ 15–21; Doc. 107, ¶¶ 15–18).  Plaintiffs additionally fear harm to their health and safety from the disturbance of sites which Defendants have identified as "high risk" and "medium risk" for hazardous substance contamination.  (Doc. 106, ¶¶ 8–9; Doc. 107, ¶¶ 8–9; *see also* AR 0419–0420, 0628).  Plaintiffs also complain that their aesthetic enjoyment of nearby wetlands and natural areas will be obstructed by the Flyover Project.  (Doc. 106, ¶¶ 11–12; Doc. 107, ¶¶ 11–12).  Because land use, economic growth, public health and

---

[4]  In support, Plaintiffs have filed an Impact Analysis Report (Doc. 108-3) which finds that the Flyover Project will significantly restrict access to surrounding businesses, thereby impairing economic growth and redevelopment to the area.

safety, and aesthetic concerns all comprise the "environment" which NEPA intends to protect, Plaintiffs fall within the statute's zone of interests.   Moreover, the threatened injuries to these environmental concerns are the proximate result of Defendants' approval and construction of the Flyover Project.   The Court therefore finds that Plaintiffs satisfy NEPA's statutory standing requirements as well.

### B.     Mootness

An extension of the standing doctrine, mootness bars a lawsuit "when it is impossible for a court to grant any effectual relief whatever to the prevailing party."   *Knox v. Serv. Emps. Int'l Union, Local 1000*, 132 S. Ct. 2277, 2287 (2012) (internal quotation marks omitted); *see also Ouachita Watch League*, 463 F.3d at 1175 ("A case is moot when the issues no longer involve a live controversy with respect to which the court can give meaningful relief.").   A moot case requires dismissal because "[a]ny decision on the merits of a moot case . . . would be an impermissible advisory opinion."   *Fla. Ass'n of Rehab. Facilities, Inc. v. State of Fla. Dep't of Health & Rehabilitative Servs.*, 225 F.3d 1208, 1217 (11th Cir. 2000).   The heavy burden of proving that a case is moot rests with the party claiming mootness and any doubts must be resolved in favor of finding a justiciable controversy.   *Adarand Constructors, Inc. v. Slater*, 528 U.S. 216, 222 (2000) (per curiam).

Defendants contend that this case has become moot during the course of the litigation because the Flyover Project is significantly finished, with more than 80% of construction complete and over 96% of federal funds spent.   (Doc. 123, pp. 13–14; Doc. 124, pp. 13–15).   Moreover, Defendants represent that the elevated overpass which forms a significant basis of Plaintiffs' complaints has been erected and is now open to

traffic.  (Doc. 124-3, ¶ 3).  Defendants therefore conclude that the Court can no longer provide the injunctive relief Plaintiffs seek in their Second Amended Verified Complaint.

However, a project that is substantially complete is, by definition, not complete. Overall, Defendants provide an inadequate picture of what the remaining 20% of construction encompasses.  While the elevated overpass is open to traffic, other aspects of the Flyover Project may warrant injunctive relief, including halting any remaining construction or enjoining the disbursement of outstanding federal funds which were procured in violation of NEPA and FAHA.  The Court could also require Defendants to conduct the appropriate environmental study required by NEPA and to take measures to mitigate environmental damage caused by the Flyover Project.  With these remedies available, and all doubts being resolved in Plaintiffs' favor, the Court concludes that it is capable of providing meaningful relief.  Accordingly, this case is not moot.

### C.    Timeliness

Lastly, Defendants challenge the Court's jurisdiction on the grounds that this lawsuit is barred by the statute of limitations or, in the alternative, by laches.  (Doc. 123, pp. 2–7; Doc. 124, pp. 7–9).  As mentioned earlier, neither NEPA nor FAHA provide private rights of action; judicial review under these statutes may only proceed through the APA, which Plaintiffs have done here.  *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1238 (9th Cir. 2005).  As such, lawsuits arising under NEPA and FAHA are subject to the APA's six year statute of limitations.  *Black Warrior*, 781 F.3d at 1285– 86.

For purposes of calculating whether a claim is time-barred under the APA, the limitations period begins to run from the date of final agency action.  *Ga. Power Co. v. Teleport Commc'ns Atlanta, Inc.*, 346 F.3d 1047, 1050 (11th Cir. 2003).  Final agency

action occurs when "the agency has completed its decisionmaking process, and . . . the result of that process is one that will directly affect the parties." *Franklin v. Massachusetts*, 505 U.S. 788, 796–97 (1992).  A merely "tentative" action is not a final agency action.  *Id.* at 797 (internal quotation marks omitted).  The burden of proving that a lawsuit is barred by the statute of limitations rests on Defendants.  *Smith v. Duff & Phelps, Inc.*, 5 F.3d 488, 492 n.9 (11th Cir. 1993).

Defendants argue that Plaintiffs' claims are barred by the APA's six-year statute of limitations because the last final agency action occurred when FHWA issued the CE in 2004.  (Doc. 112, pp. 21–24; Doc. 123, pp. 2–5; Doc. 124, pp. 7–9).  As a result, Defendants calculate that Plaintiffs' NEPA and FAHA claims expired in 2010, well before the start of this lawsuit.  Defendants also disagree that they re-opened the limitations period by re-evaluating the Flyover Project and confirming its status as a CE in 2005 and 2012.  (Doc. 123, pp. 4–5; Doc. 124, pp. 7–9).  Defendants reason that the subsequent confirmation of a prior final agency action is not itself final agency action subject to review.

However, "[c]ourts have consistently held that the statute of limitations does not bar review of agency actions that reopen a previously decided issue when the agency reaches the same decision at a subsequent proceeding."  *SLPR, LLC v. U.S. Army Corps of Eng'rs*, No. 06 CV 1327 MMA (POR), 2011 WL 1648732, at *5 (S.D. Cal. May 2, 2011); *see also Pub. Citizen v. Nuclear Regulatory Comm'n*, 901 F.2d 147, 151–52 (D.C. Cir. 1990) ("[T]o the extent that an agency's action necessarily raises the question of whether an earlier action was lawful, review of the earlier action for lawfulness is not time-barred.") (internal quotation marks omitted), *cert. denied*, 498 U.S. 992 (1990).  An agency may re-open a matter either explicitly or implicitly, and the question of whether an agency actually re-opened a matter depends on the totality of the circumstances.  *Bluewater Network v.*

*E.P.A.*, 370 F.3d 1, 16–17 (D.C. Cir. 2004).  If the agency's conduct demonstrates that it "actually reconsidered [its action], the matter has been reopened."  *Id.* (internal quotation marks omitted).

Here, Defendants' conduct demonstrates that they actually reconsidered their approval of the Flyover Project as a CE on two occasions, as required by NEPA and FAHA.  *See* 23 C.F.R. § 771.129(c).  Most recently, Defendants conducted a re-evaluation in 2012 to consider the potential environmental impacts of design changes to the length of the elevated overpass and to the width of a median.  (AR 0623–0637). Defendants ultimately determined that these changes would involve no significant impacts to the environment and affirmed the Flyover Project's status as a CE.  (AR 0624). Accordingly, pursuant to Defendants' ongoing duty to ensure the lawfulness of their actions, they re-examined the Flyover Project in light of the changed circumstances, reconsidered the project's categorical exclusion, and determined that the CE classification remained appropriate.  This conduct expressly re-opened the CE and constitutes final agency action that began a new six-year limitations period, thus allowing the initiation of the instant case until 2018.  Because Plaintiffs filed their complaint in 2013, the statute of limitations will not act to bar their lawsuit.

Moreover, the Court finds untenable Defendants' rationale that it could not have re-opened the limitations period just because it approved of its prior action.  The policy implications of adopting Defendants' position are two-fold.  First, federal agencies would be encouraged to blindly approve all prior actions in order to elude challenges by plaintiffs. Second, and as a corollary, where a federal agency foresaw substantial public controversy or opposition to a major federal action, the agency would be encouraged to approve the project far in advance in order to temper the potential backlash and then sit

on its decision (with the necessary periodic approvals) until it was ready to initiate the project.   Both situations would effectively render the re-evaluation requirement meaningless, a result Congress surely did not intend.

Plaintiffs' lawsuit is also not barred by the doctrine of laches.  Laches provides an equitable defense to bar a lawsuit where the plaintiff knew of his right to bring his claims, but failed to do so, effectively sitting on his rights to the defendant's detriment.  *Black Warrior*, 781 F.3d at 1283.  Therefore, in order to prove the laches defense, Defendants must prove that Plaintiffs delayed in asserting their rights, Plaintiffs' delay was inexcusable, and Plaintiffs' delay has caused Defendants' undue prejudice.  *Id.*

However, the United States Supreme Court recently re-affirmed the long-standing principle that, "in face of a statute of limitations enacted by Congress, laches cannot be invoked to bar legal relief."  *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S. Ct. 1962, 1974 (2014).  The reasoning, as the *Petrella* Court alludes, is intuitive: laches emerged as a defense to suits brought in equity because there was no defined time limit within which a plaintiff was required to bring his claim for relief; thus, there was a practical need for parties to know that there was a point in time at which the specter of litigation no longer loomed and their rights were settled.  *See id.* at 1973–75.  However, with the merger of law and equity came the advent of the statute of limitations, which effectively dispensed with the malleable and indeterminate laches inquiry in favor of a clear and definitive time period in which a plaintiff must file his complaint.  *See id.*  As a result, where Congress has acted to provide a statute of limitations, the laches doctrine affords no additional defense.[5]   *Id.* at 1973–74; *see also id.* at 1975 ("[W]e have never applied laches to

---

[5]   It is worth noting that the *Petrella* Court left open the possibility that, notwithstanding a statute of limitations, laches can be employed in "extraordinary circumstances" to curtail the equitable relief sought by a plaintiff where his delay in bringing suit is "of

bar . . . claims for discrete wrongs occurring within a federally prescribed limitations period.") (footnote omitted); *Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 652 (2010) ("Laches within the term of the statute of limitations is no defense at law[.]") (quoting *United States v. Mack*, 295 U.S. 480, 489 (1935) (internal quotation marks omitted)); *Oneida Cnty., N.Y. v. Oneida Indian Nation of N.Y. State*, 470 U.S. 226, 244 n.16 (1985) (noting that the "application of the equitable defense of laches in an action at law would be novel indeed").   Conversely, it is only where a federal statute lacks such a limitations period that a defendant may appeal to the laches defense.  *Petrella*, 134 S. Ct. at 1974–75 (referring to "the essentially gap-filling, not legislation-overriding, office of laches").

Plaintiffs bring this case under NEPA and FAHA, which offer no explicit statute of limitations on their own.  Notwithstanding, the APA's six year statute of limitations applies to challenges arising under both statutes.  Accordingly, because Plaintiffs brought their claims within the statute of limitations provided by Congress, Defendants may not avail themselves of the doctrine of laches.  This lawsuit is therefore timely.

Having resolved the numerous questions regarding subject matter jurisdiction, the Court proceeds to the merits.

### D.    Use of Categorical Exclusions

#### 1.    Regulatory Requirements

As described at the beginning of this Order, NEPA allows an agency to promulgate its own standards for when a major federal project requires an EIS or when it may proceed as a CE.  40 C.F.R. § 1508.4.  FHWA did just that by enacting 23 C.F.R. § 771.117.  In

---

sufficient magnitude." *Petrella*, 134 S. Ct. at 1977–79.  The Eleventh Circuit also appears to recognize such a possibility. *Black Warrior*, 781 F.3d at 1286 n.10.  The Court will determine whether laches acts to limit any equitable relief Plaintiffs request at the appropriate time.

2004 when the Flyover Project was first classified as a CE, § 771.117 was divided into subsections (a) through (e).  Subsection (a) provides the general definition which all CEs must satisfy under FAHA:

> Categorical Exclusions (CEs) are actions which meet the definition contained in 40 C.F.R. 1508.4,[6] and, based on past experience with similar actions, do not involve significant environmental impacts.  They are actions which: do not induce significant impacts to planned growth or land use for the area; do not require the relocation of significant numbers of people; do not have a significant impact on any natural, cultural, recreational, historic or other resource; do not involve significant air, noise, or water quality impacts; do not have significant impacts on travel patterns; or do not otherwise, either individually or cumulatively, have any significant environmental impacts.

23 C.F.R. § 771.117(a) (2003) (footnote added).

Subsections (c) and (d) supply extensive, although non-exhaustive, lists of types of projects which have been found to qualify as CEs under NEPA.  Subsection (c) lists projects—referred to as "undocumented" or "c-list" CEs—which do not directly involve construction and are generally so minor in degree or scope that no documentation or approval by FHWA is required.[7]   U.S. Dep't of Transp., Fed. Highway Admin., *FHWA Technical Advisory T6640.8A* (1987) (hereinafter "FHWA T6640.8A").[8]   The parties and the Court agree that the Flyover Project does not fall within this category of CEs.

---

[6]   Title 40 C.F.R. § 1508.4 provides the general definition of a CE under NEPA: "[A] category of actions which do not individually or cumulatively have a significant effect on the human environment . . . ."

[7]   Examples include landscaping, the installation of fencing, signage, and pavement markers, improvements to rest areas and truck weigh stations, and railroad track maintenance.  *See* 23 C.F.R. § 771.117(c) (2003).

[8]   *Available at* http://environment.fhwa.dot.gov/projdev/impTA6640.asp#ce (last visited June 30, 2015).

Subsection (d) lists projects—referred to as "documented" or "d-list" CEs—which have "a higher potential for [environmental] impacts," thus requiring documentation and FHWA approval.  FHWA T6640.8A.  Subsection (d) identifies twelve types of projects:

(1)   Modernization of a highway by resurfacing, restoration, rehabilitation, reconstruction, adding shoulders, or adding auxiliary lanes (e.g., parking, weaving, turning, climbing).

(2)   Highway safety or traffic operations improvement projects including the installation of ramp metering control devices and lighting.

(3)   Bridge rehabilitation, reconstruction or replacement or the construction of grade separation to replace existing at-grade railroad crossings.

(4)   Transportation corridor fringe parking facilities.

(5)   Construction of new truck weigh stations or rest areas.

(6)   Approvals for disposal of excess right-of-way or for joint or limited use of right-of-way . . . .

(7)   Approvals for changes in access control.

(8)   Construction of new bus storage and maintenance facilities in areas used predominantly for industrial or transportation purposes . . . .

(9)   Rehabilitation or reconstruction of existing rail and bus buildings and ancillary facilities . . . .

(10)  Construction of bus transfer facilities . . . .

(11)  Construction of rail storage and maintenance facilities in areas used predominantly for industrial or transportation purposes . . . .

(12)  Acquisition of land for hardship or protective purposes . . . .

23 C.F.R. § 771.117(d) (2003).  The parties and the Court agree that FHWA approved the Flyover Project as a d-list CE.  (*See* AR 0402–0425).

Subsection (b) provides that, although a project may be classified as a CE under

subsections (c) or (d), FHWA must nevertheless undertake additional environmental analysis where "unusual circumstances" exist, such as impacts to certain historic properties or where a significant environmental controversy surrounds the project. 23 C.F.R. § 771.117(b) (2003).  The parties and the Court agree that the Flyover Project involves no unusual circumstances.  Finally, subsection (e) enables FHWA to add projects to subsections (c) and (d) when "a pattern emerges of granting CE status for a particular type of action."  *Id.* § 771.117(e).

### 2.    Defendants Improperly Classified the Flyover Project as a Categorical Exclusion

Although Defendants initially classified the Flyover Project as a d-list CE and subsequently affirmed that classification in 2005 and 2012,[9] the Court questioned those determinations in its Rule 56(f) order.  Specifically the Court indicated that the Flyover Project "does not fall within, nor is it remotely similar to, any of [subsection (d)'s] listed actions."  (Doc. 122, p. 4).  The Court then asked Defendants to explain why the Flyover Project was classified as a d-list CE and to provide case law in support.  (*Id.* at p. 5).  Despite a valiant effort, the Court finds Defendants' arguments unavailing and concludes that the initial classification of the Flyover Project as a d-list CE violated NEPA's procedures.  Although that initial classification is now beyond the Court's review due to the running of the statute of limitations, Defendants' affirmance of the Flyover Project as a CE in 2012 is not.  Because the 2012 affirmance equally violates NEPA (and consequently FAHA), Plaintiffs are entitled to summary judgment.

---

[9]   For all relevant purposes, 23 C.F.R. § 771.117 remained unchanged when Defendants re-evaluated the Flyover Project in 2005 and 2012.  For simplicity's sake, the Court will hereinafter cite to § 771.117 without reference to year and the parties should assume that the Court applies the 2003 edition of the regulation to Defendants' initial CE determination and the 2011 edition of the regulation to the 2012 re-evaluation.

To reiterate, § 771.117(d) provides a non-exhaustive list of the types of projects that will generally qualify as CEs.  Indeed, FHWA's guidance on how to classify projects under subsection (d) directs that "[t]he actions on the list should be used as a guide to identify other actions that may be processed as CEs."  FHWA T6640.8A.  Therefore, although Defendants admit that the Flyover Project does not expressly fall within any of the twelve enumerated categories of d-list CEs, they submit that it "resemble[s] various examples listed in 771.117(d); namely (d)(1)–(3)."  (Doc. 123, p. 10; Doc. 124, pp. 6–7).

The Court finds that the Flyover Project is not even remotely similar in scope to those types of projects identified by Defendants or any other included in § 771.117(d). The Flyover Project involves the construction of a four-lane, 112-foot-wide, three-span elevated overpass which will allow traffic traveling on US 17-92 to cross SR 436 without interruption.  (AR 0407).  The center span of the overpass will be 190 feet long with the entire bridge structure reaching 375 feet in length.  (*Id.*).  A total of nine lanes of frontage roads, two bicycle lanes, sodded buffers, and two sidewalks will also be added to US 17-92's ground level.  (*Id.*).  With these frontage road additions, US 17-92 will expand to 244 feet at its widest point.  (*See id.*).  Because of the size of the entire overpass structure, certain roads near the intersection will be converted to "right-in right-out" only access, meaning that traffic may only enter or exit these roadways by turning right with the flow of traffic.  (*Id.*).  The Flyover Project will also expand SR 436 by adding three westbound lanes of vehicular traffic.  (*Id.*).  Overall, the Flyover Project's footprint will extend one mile in each direction from the intersection of US 17-92 and SR 436 (AR 0406) and requires an additional 10.35 acres of land, which Defendants propose to acquire by relocating thirty-five business and one residence at a cost of just over $45 million (AR 0409; Doc. 112-1, ¶ 4).  Defendants estimate that the total cost of the Flyover Project will exceed

$70 million, of which more than $60 million will come from federal funds.   (AR 0017; Doc. 112-1, ¶ 14).

First, the Flyover Project is nowhere near the type of project contemplated by subsection (d)(2), which affords CE status to highway safety and traffic operations projects, such as the installation of ramp metering devices and lighting (*i.e.*, street lights and traffic signals).   23 C.F.R. § 771.117(d)(2); *see also* U.S. Dep't of Transp., Fed. Highway Admin., *Ramp Metering: A Proven, Cost Effective Operational Strategy* (2014).[10] Although the Flyover Project undoubtedly involves installing traffic signals and lighting, it cannot be said with any degree of sincerity that building a massive highway overpass is similar in scope.

Defendants' comparison of the Flyover Project to those projects described by subsection (d)(3) is similarly unconvincing.    That category of projects involves rehabilitation and reconstruction projects to existing bridges or construction of above-grade railroad crossings to replace existing at-grade crossings.    23 C.F.R. § 771.117(d)(3).   Defendants hinge their comparison on the latter type of construction, reasoning that an above-grade highway overpass should be considered the same type of project as an above-grade railroad crossing.   (Doc. 124, pp. 6–7).   Although unavailable at the time Defendants filed their supplemental briefs, recent case law from a Virginia district court supports Defendants' position.   *See Rio Assocs., L.P. v. Layne*, No. 3:15-cv-00012, 2015 WL 3546647, at *9 (W.D. Va. June 8, 2015) (upholding CE for highway overpass project on the basis that "a highway [grade-separated interchange] is analogous to a railroad [grade-separated interchange]").

---

[10]     *Available at* http://www.ops.fhwa.dot.gov/publications/fhwahop14020/fhwahop14020.pdf (last visited June 30, 2015).

However, the Court finds such an analogy unreasonable.  As a practical matter, the Flyover Project does not involve the grade separation of an existing railroad crossing, but rather enlarging a highway interchange via a 375-foot-long elevated overpass and other roadway expansions on all sides.  (AR 0406–0407).  The amount of land and construction materials needed to transform the existing highway intersection into the Flyover Project is simply mammoth compared to what is required to change the grade of a single railroad crossing.

Moreover, Plaintiffs rightly emphasize that the overarching definition of a CE precludes the Flyover Project from being lawfully classified as a CE under subsection (d)(3).  The reason above-grade railroad crossing projects can be classified as CEs is that they involve no significant changes to travel patterns; the course of highway traffic remains unaffected regardless of whether a railroad crosses above, below, or at the same grade as the road it crosses.  *See* 40 C.F.R. § 771.117(a); *Van Raden v. City of Portland*, No. CV 01-233-BR, 2001 WL 34047031, at *1, 6 (D. Or. May 31, 2001) (affirming CE under subsection (d)(3) for project that would replace five at-grade railroad crossings with one above-grade crossing).  The Flyover Project is therefore not comparable to a grade-separated railroad crossing and cannot be categorically excluded under subsection (d)(3).

Defendants' best argument lies in equating the Flyover Project with those projects in subsection (d)(1): the "[m]odernization of a highway by resurfacing, restoration, rehabilitation, reconstruction, adding shoulders, or adding auxiliary lanes."  23 C.F.R. § 771.117(d)(1).  Defendants specifically focus on reconstruction.  (Doc. 124, p. 6).

A careful reading of subsection (d)(1) shows why the Flyover Project does not fall within its gamut.  It is certainly true that the Flyover Project involves the modernization of a highway interchange; however, it is the method by which that modernization is

accomplished which distinguishes the Flyover Project from those projects categorically excluded under subsection (d)(1). The Flyover Project does not primarily involve resurfacing, which would entail replacing the existing road surface with some form of asphalt, concrete, tar, or other sealant. The Flyover Project similarly does not involve restoration, rehabilitation, or reconstruction, which would entail placing the roadways back in the same or similar condition as when they were first constructed, prior to any sort of deterioration.[11] Finally, the Flyover Project simply cannot be described as a project to add shoulders or auxiliary lanes.

By way of comparison, the vast majority of available case law bolsters the Court's conclusion that the Flyover Project is not the type of major federal action that can be categorically excluded. In its Rule 56(f) order, the Court pointed the parties to the highway project in *West v. Secretary of the Department of Transportation*, 206 F.3d 920 (9th Cir. 2000), as analogous to the Flyover Project. In *West*, the Washington State Department of Transportation proposed an $18.6 million, two-stage highway interchange project. *Id.* at 923. The first stage consisted of building a new four-lane, fully-directional interchange on top of a current interstate highway, while the second stage involved various upgrades to the interchange. *Id.* Upon reviewing the scope of projects listed by subsection (d), the *West* court found that the interchange project was so large—involving massive quantities of fill material, surfacing, and concrete—that it did not compare to any of the more minor

---

[11] It is notable that § 771.117(d) clearly distinguishes between "construction" and "*re*construction." For example, subsection (d)(5) categorically excludes the "construction of new truck weigh stations or rest areas," while subsection (d)(9) categorically excludes certain "reconstruction of existing rail and bus buildings." Because regulatory language should be given its plain meaning, *Evenson v. Hartford Life & Annuity Ins. Co.*, 244 F.R.D. 666, 667 (M.D. Fla. 2007), it is clear that "construction" and "reconstruction" are not to be read interchangeably as Defendants imply (Doc. 124, p. 6).

projects listed under subsection (d), especially those labeled as restorative, rehabilitative, or reconstruction.  *Id.* at 928.  Like the highway project in *West*, the Flyover Project is of "a very different scale" than what subsection (d) contemplates.  *Id.*

Ironically, all six of the cases Defendants discuss in their supplemental briefs also lend support the Court's conclusion that the Flyover Project was improperly classified as a CE.  In the only case Defendants cite that has precedential value for this Court, the former Fifth Circuit affirmed the categorical exclusion of a project to rebuild a bridge destroyed by a hurricane.  *Sierra Club v. Hassell*, 636 F.2d 1095, 1097 (5th Cir. Unit B Feb. 13, 1981).[12]  The appellate court aptly noticed that "[t]he reconstruction project will only restore an environmental situation that had existed for twenty-four years" and would "not significantly alter the status quo" because the replacement bridge would be essentially identical to the original bridge.  *Id.* at 1099.

In *Aquifer Guardians in Urban Areas v. Federal Highway Administration*, 779 F. Supp. 2d 542 (W.D. Tex. 2011), the court affirmed the categorical exclusion of a project to add two onramps to connect an existing overpass with the road underneath.  *Id.* at 551–53.  The project's ultimate goal was to increase safety and accessibility between the two roadways, as drivers were previously required to exit the interchange and utilize side streets to access the disconnected roadway.  *Id.*  Relying on deference to the agency's decision, the *Aquifer Guardians* court found the categorical exclusion of this project reasonable.  *Id.* at 555–56.

In *Florida Keys Citizens Coalition, Inc. v. U.S. Army Corps of Engineers*, 374 F. Supp. 2d 1116 (S.D. Fla. 2005), the court affirmed a d-list CE for a portion of a highway

---

[12]  In *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit that were handed down prior to October 1, 1981.

project that involved replacing an existing bridge, widening shoulders, and other minor safety improvements.  *Id.* at 1132, 1141.  In analyzing the CE, the court specifically distinguished the project from the project examined in *West*, noting that the scope of the *West* project went far beyond the widening of shoulders and other minor safety improvements.  *Id.* at 1143–44.  The *Fla. Keys* court additionally found that the project under its review would not affect the capacity of roadways, but was merely intended to increase safety.  *Id.* at 1144.

In *Hells Canyon Preservation Council v. Jacoby*, 9 F. Supp. 2d 1216 (D. Or. 1998), the court affirmed a d-list CE for the reconstruction of a road that was destroyed by flooding.  *Id.* at 1224–25, 1237.  The reconstruction ultimately involved relocating the road away from a nearby stream and elevating the road by twenty-five to thirty feet in order to avoid future flooding.  *Id.* at 1225–26.  The court concluded that this type of project fit the scope of a d-list project because the rebuilt road would be identical to the original, therefore falling within "the plain meaning of the terms resurfacing, restoration, rehabilitation, and reconstruction."  *Id.* at 1225, 1237.

In a case Defendants call "strikingly similar" to this one (Doc. 124, p. 12), the court in *Ware v. U.S. Federal Highway Administration*, No. Civ.A. H-04-2295, 2006 WL 696551 (S.D. Tex. Mar. 15, 2006), *aff'd*, 255 F. App'x 838 (5th Cir. 2007) (per curiam), *cert. denied*, 554 U.S. 919 (2008), affirmed a d-list CE for a highway improvement project involving the construction of a single onramp to an existing overpass, auxiliary weaving lanes, and adjacent noise barriers.  *Id.* at *2–3.  The *Ware* court found that this project clearly fit the scope of a rehabilitative project, as no additional lanes would be constructed to increase traffic capacity; rather, the project was limited to the minor purpose of increasing overall safety and traffic flow.  *Id.* at *21–22.

Finally, in *Public Interest Research Group of New Jersey, Inc. v. Federal Highway Administration*, 884 F. Supp. 876 (D.N.J. 1995), *aff'd*, 65 F.3d 163 (3d Cir. 1995), the court affirmed both a d-list CE to widen a two-lane highway to four lanes and the subsequent re-evaluation of that CE after the project was modified to change the two added lanes from primary lanes to HOV lanes.  *Id.* at 879–82.  Of importance to the court in reaching its conclusion was the fact that this highway project was "designed to meet existing demand," as opposed to stimulating growth or accommodating future traffic conditions.  *Id.* at 891.

In their analyses of these cases, Defendants unduly focus on the purpose of the projects at issue, concluding that projects intended to relieve traffic congestion by increasing roadway capacity and safety may be categorically excluded under subsection (d).  (Doc. 124. pp. 11–12 & nn.11–12).  However, it is not the purpose of a project that permits its categorical exclusion, but rather its scope in comparison to the types of projects described in those categories.  In fact, the district courts in *Ware* and *Florida Keys* explicitly rejected Defendants' notion that capacity-increasing projects such as the Flyover Project may be categorically excluded, finding that they are beyond the scope of subsection (d).  *Ware*, 2006 WL 696551, at *21 ("The case law supports the . . . distinction between 'added capacity' projects, *which are not eligible for Categorical Exclusion status*, and 'safety' and 'modernization' projects, which are eligible.") (emphasis added); *Fla. Keys*, 374 F. Supp. 2d at 1141 ("[R]oadway reconstruction projects that do not increase capacity, but provide safety improvements . . . are normally categorically excluded from detailed NEPA study.") (internal quotation marks omitted).

Indeed, these six cases illustrate the minor scale of the projects anticipated by § 771.117(d).  D-list projects generally involve replacing infrastructure that already exists

or was destroyed, meeting current demands at present infrastructure, or increasing safety and accessibility to present infrastructure—all types of projects which essentially maintain the status quo. *See Hassel*, 636 F.2d 1095 at 1099. In contrast, the Flyover Project consists of a massive endeavor to build new infrastructure to accommodate more traffic and stimulate growth, which will be achieved through a brand new four-lane, 375-foot-long elevated overpass and additional lanes of traffic. The projects contemplated by subsection (d) pale in comparison. *See also, e.g.*, *No East-West Highway Comm., Inc. v. Chandler*, 767 F.2d 21, 26 (1st Cir. 1985) (affirming FHWA's decision not to prepare EIS for project to widen two-lane highway by fifteen feet); *Piedmont Envtl. Council v. U.S. Dep't of Transp.*, 159 F. Supp. 2d 260, 289 (W.D. Va. 2001) (affirming d-list CE for project to widen existing bridge), *aff'd*, 58 F. App'x 20 (4th Cir. 2003); *Van Raden*, 2001 WL 34047031, at *1, 6 (affirming d-list CE for project that would replace five at-grade railroad crossings with one above-grade crossing); *Citizens for the Scenic Severn River Bridge, Inc. v. Skinner*, 802 F. Supp. 1325, 1332–33 (D. Md. 1991) (affirming d-list CE for project that would replace existing two-lane bridge with newer two-lane bridge), *aff'd*, 972 F.2d 338 (4th Cir. 1992).

## IV.   CONCLUSION

The above review of § 771.117 and comparisons to other cases leads to the inescapable conclusion that the Flyover Project cannot be categorically excluded under NEPA. The Flyover Project, which principally involves increasing the capacity of the US 17-92/SR 436 corridor by constructing a new, four-lane elevated overpass, cannot be said to be a project involving "restoration," "reconstruction," or "rehabilitation." Moreover, the magnitude of the Flyover Project far surpasses the scope of highway projects envisioned by § 771.117(d). As a result, Defendants were required by NEPA and FAHA to prepare

either an EA or an EIS.  Defendants failed to do so, rendering their 2012 confirmation of the Flyover Project as a CE arbitrary and capricious.

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Pursuant to Federal Rule of Civil Procedure 56(f)(2), Plaintiffs' Motion for Summary Judgment (Doc. 105) is **GRANTED**.

2. State Defendants' Cross-Motion for Summary Judgment (Doc. 112) is **DENIED**.

3. Federal Defendants' Cross-Motion for Summary Judgment (Doc. 114) is **DENIED**.

4. The Court will schedule a hearing to discuss appropriate remedies.  A separate notice will follow.

**DONE AND ORDERED** in Orlando, Florida on June 30, 2015.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel of Record